UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SHAKERA CHOUDHURY,<br><br>                                     Plaintiff,<br><br>                  -v-<br><br>NYC HEALTH & HOSPITALS CORP.,<br><br>                                     Defendant. | 25 Civ. 5240 (PAE)<br><br><u>OPINION & ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

This case involves claims of employment discrimination.  Plaintiff Shakera Choudhury, who is Muslim and Bengali, alleges that she was subjected to retaliation and discrimination based on her race, religion, and national origin during her employment with defendant New York City Health and Hospitals Corporation ("H+H").  She alleges that she was mocked for her appearance, insulted for being Muslim, denied training and mentorship opportunities, and ignored when she complained about such incidents.  She further alleges that she was terminated based on her protected characteristics, and in retaliation for her complaints.  She brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

Currently before the Court is H+H's motion to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the Court grants the motion in part.

1

## I.   Factual Background[1]

### A.   Choudhury Begins Work and Faces Discrimination

On June 5, 2023, H+H hired Choudhury as a patient care associate at NYC Health + Hospitals/Bellevue ("Bellevue").  Dkt. 14 ("AC") ¶¶ 4, 9.  Her role involved clerical tasks and patient care services, such as taking patients' vital signs, performing electrocardiograms and other tests, and assisting doctors during medical emergencies.  *Id.*  She reported to head nurses Anny Lebron and Gazelle Ramos, and nurse educator Esther Frimpong.  *Id.* ¶ 10.

Choudhury, who is Muslim and Bangladeshi, was the only individual of that religion and nationality on her team.  *Id.* ¶ 11.  Weeks into starting the job, Choudhury was subjected to discriminatory comments related to her race, religion, and national origin.  *Id.* ¶ 13.

---

[1] The Court draws the facts in this decision principally from the Amended Complaint, Dkt. 14 ("AC").  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true, drawing all reasonable inferences in Choudhury's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Choudhury argues that the Court may not consider "Exhibit C," Dkt. 19-3—a letter from Damon Levenstien regarding Choudhury's disciplinary proceedings—because it "is neither incorporated by reference nor integral to the Complaint."  Dkt. 27 ("Opp'n") at 6.  H+H counters that Exhibit C is incorporated by reference in AC ¶ 51, which includes a quotation from Choudhury's termination letter, which, in turn, references the Levenstien letter.  Dkt. 33 ("Reply") at 1.  That, however, is short of the "clear, definite, and substantial reference," *Martin v. City Univ.*, No. 17 Civ. 6791, 2018 WL 6510805, at *5 (S.D.N.Y. Dec. 11, 2018) (citation omitted), needed for a document to be incorporated by, or integral to, a complaint.  *See, e.g., Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." (cleaned up)).  The Court therefore does not consider Exhibit C.

The Court also declines to convert the instant motion into one for summary judgment to enable it to consider that document, as H+H urges, Reply at 2, because "discovery has not yet been completed," *GeBBS Healthcare Sols., Inc. v. Orion Healthcorp, Inc.*, No. 16 Civ. 2206, 2017 WL 1251143, at *5 (S.D.N.Y. Apr. 4, 2017); *see also Kissner v. Inter-Cont'l Hotels Corp.*, No. 97 Civ. 8400, 1998 WL 337067, at *3 n.2 (S.D.N.Y. June 25, 1998).

On June 12, 2023, during Choudhury's orientation, patient care associate Karen Shaw-Morrison told her that "this is not your home country, this is the United States," and that she should "work like a non-Muslim." *Id.* ¶ 14. Shaw-Morrison also asked Choudhury if "all Bangladeshis cover their heads," and told her "not to cover up" while at work. *Id.* ¶ 15. The next day, Choudhury reported these statements to Ramos, who "dismissed the complaint with a laugh," and stated that she assumed, based on Choudhury's skin color and facial features, that Choudhury was from Haiti, not Bangladesh. *Id.* ¶ 16. Ramos informed Choudhury that she would be reassigned to a different patient care associate, but did not take any other action. *Id.*

On June 21, 2023, Frimpong told Choudhury that she would be reassigned to Bellevue's geriatric clinic for continued training. *Id.* ¶ 18. Lebron escorted Choudhury to the clinic and introduced her to patient care associate Tessy Pius and staff nurse Shazman Karmoeddien. *Id.* ¶ 19. Pius stated, "I cannot train this girl. She's Muslim," and asked whether Choudhury "even speak[s] English." *Id.* ¶ 20. Lebron and Karmoeddien did not address these remarks, but told Pius that she was required to train Choudhury. *Id.* At the end of Choudhury's shift, she reported the remarks to Ramos, who acknowledged the complaint and told Choudhury to go home. *Id.* ¶ 21.

On June 28, 2023, Frimpong told Choudhury that patient care associates were unwilling to mentor her in phlebotomy because of her ethnicity. *Id.* ¶ 22. Frimpong stated: "[I]f you were Black or straight white, that would've been okay." *Id.*

On July 3, 2023, patient care associate Gonpo Lama sprayed cologne on Choudhury, telling her that she smelled like a "Bangladeshi Muslim" and that he wanted the "smell gone." *Id.* ¶ 24. Choudhury reported the incident to Lebron by text but did not receive a response. *Id.*

3

On July 5, 2023, Choudhury asked Lebron and staff nurse Jennifer Juarbe for permission to attend Friday prayer at Bellevue's Muslim prayer room. *Id.* ¶ 25. They denied the request and mocked her for mistaking Bellevue for her "religious home." *Id.* That day, Choudhury complained to Ramos that she had been prevented from praying while another patient care associate of a different religion was permitted to attend prayer. *Id.* ¶ 27. Ramos responded that she would escalate the complaint to the union representative and arrange a meeting for the three of them, but no such meeting occurred. *Id.* That same day, Choudhury also reported the prayer incident to assistant director of nursing John Barker, who laughed and offered no response. *Id.* ¶ 28

On July 6, 2023, Choudhury reported to Frimpong for training. *Id.* ¶ 29. Frimpong directed Choudhury to complete the day's training with a different technician, who Frimpong said was "like" Choudhury because she was Bangladeshi and Muslim. *Id.*

On July 21, 2023, Lama and Shaw-Morrison sprayed perfume and air freshener on Choudhury, while telling her that she "smell[ed] like a Muslim." *Id.* ¶ 30. Choudhury reported this incident to Lebron by text but did not receive a response. *Id.*

On August 8, 2023, Lama, Shaw Morrison, and two other patient care associates referred to Choudhury as "the only Muslim on the second floor," stated that "Muslims don't work here," and told Choudhury to "stay home" because she didn't "belong in this job field." *Id.* ¶ 31. Choudhury reported these comments to Lebron by text and email but did not receive a response. *Id.* ¶ 32.

On August 9, 2023, Lebron criticized Choudhury for not making eye contact with patients, and asked Choudhury if avoiding eye contact was part of her religion. *Id.* ¶ 33. Lebron told Choudhury to "fix that crap," and that she could "keep [her] gaze down when [she] visit[s]

[her] home country," but "not here." *Id.* When Choudhury pushed back, Lebron said that Muslims should expect this treatment "since 9/11" and that Muslim immigrants are "making everything crazy." *Id.*

On September 20, 2023, on a phone call about an issue related to a patient's vaccination regimen, Lebron called Choudhury a "Muslim bastard," and told her "no one likes Muslims," "Bangladeshi immigrants are garbage," and "Muslim and Bangladeshi immigrants don't belong here." *Id.* ¶ 34. She told Choudhury to "get lost and get back to work" and warned Choudhury not to "make [her] deal with this shit again." *Id.*

On October 17, 2023, when Choudhury arrived approximately 15 minutes late to work due to train delays, Juarbe said she looked "ugly" and asked if Choudhury had a "facial done" instead of coming to work on time. *Id.* ¶ 35. Another coordinator remarked, "If you wanted to get your face clean, you could have done it over the weekend or after work," and stated that Muslim immigrants use work hours to clean "their dirty colored faces." *Id.* Choudhury reported these statements to clinic director Tracey Capers, who instructed her to detail the incident in an email and take a few days off of work. *Id.* ¶ 36.

**B.      Choudhury Escalates Her Complaints**

On October 18, 2023, Choudhury emailed Capers to report the comments from the day before. *Id.* ¶ 37. On a call later that day, Capers acknowledged that such conduct violated H+H's discrimination policies, but stated that she relies on her "staff and floor admins to handle these issues" and does not "care what's happening or who's being harassed or discriminated against." *Id.* She told Choudhury to call a union representative and "let them deal with it." *Id.* Choudhury texted Lebron and Ramos to request a union meeting. *Id.* ¶ 38.

On October 19, 2023, Lebron instructed Choudhury to report for a meeting with a union representative. *Id.* ¶ 39. When Choudhury arrived, Lebron, Ramos, Pius, and Barker were present. *Id.* Lebron told Choudhury that Pius would act as her union representative, to which Choudhury objected because Pius had been involved in prior instances of discrimination against her. *Id.* The meeting proceeded over Choudhury's objection. *Id.* Barker told Choudhury that he had "heard a lot of things" about Choudhury's complaints and asked, "[W]ho do you think you are? This is a city hospital—you think people care and listen to your concerns." *Id.* ¶ 40. He said that he "can't stand Muslims" and that Choudhury "should be lucky to work here" because "[n]o one can stand Muslims or Bangladeshi immigrants in this clinic," which is why "most of our employees are non-Muslim" and she is "the only Bangladeshi on this floor." *Id.* Choudhury asked that they end the meeting and reschedule it with a neutral union representative, but Barker denied her request. *Id.* ¶ 41.

**C.    Barker Continues to Discriminate and Terminates Choudhury**

On October 23, 2023, Barker was seated nearby while Choudhury met with Ramos about scheduling matters. *Id.* ¶ 42. He told Choudhury to "stay away" because he didn't want to become Muslim, and to stand outside the door to talk to Ramos, so as not to be in front of Barker. *Id.* He also told Choudhury to "get a life" and stated that he "can't stand Muslims." *Id.* Choudhury reported the incident to Lebron by text but did not receive a response. *Id.*

On October 26, 2023, Barker called Choudhury into a meeting and told her that her employment was terminated (the "Barker termination"). *Id.* ¶ 43. He told Choudhury that he was firing her because she was Muslim, and stated, "I don't like Muslims." *Id.* He directed her to return her work identification ("ID") and other company property to human resources and leave the building. *Id.* That same day, Choudhury emailed Lebron and Ramos to report the Barker termination. *Id.* ¶ 44. She referenced "all the discrimination, harassment, and name

6

calling" that she had experienced, and stated that Barker "has no right to fire [her] from a City Hospital for being Muslim." *Id.*

Based on Choudhury's written complaint, H+H reversed the Barker termination. *Id.* ¶ 45. It did not, however, respond to Choudhury's complaint or return her confiscated ID. *Id.* For months, Choudhury was unsure whether she was able to return to work. *Id.* ¶ 46.

**D.    Choudhury Receives Notice of Disciplinary Proceedings and Official Termination**

On January 9, 2024, H+H notified Choudhury that disciplinary charges were being initiated against her for failing to report to work. *Id.* ¶ 47.

On January 15, 2024, Choudhury spoke by phone with labor relations associate Rami Mohamed regarding the charges. *Id.* ¶ 48. She explained the circumstances of the Barker termination and said that she did not understand the basis for the charges. *Id.* On January 16, 2024, in a follow-up email to Choudhury, Mohamed acknowledged her confusion but stated that H+H would proceed with the disciplinary process to determine the status of her employment. *Id.* ¶ 49.

On April 25, 2024, Choudhury received a letter from director of employee relations Sabrina Joslyn regarding the disciplinary charges and her employment status (the "official termination"). *Id.* ¶ 51. The letter stated: "By letter dated April 12, 2024, the . . . decision was issued, and sustained the penalty of termination from your employment. The effective date of termination is April 24, 2024." *Id.*; *see also* Dkt. 19-4 ("Termination Letter").

**E.    Choudhury Files an EEOC Charge**

On November 19, 2024, Choudhury filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging claims under Title VII. *Id.* ¶ 7.

7

Choudhury's EEOC Charge alleged discrimination based on "color," "national origin," "religion," and "retaliation." Dkt. 19-1 ("EEOC Charge") at 2. The EEOC Charge stated that the earliest date her discrimination occurred was June 12, 2023, and the latest date was April 24, 2024. *Id.* It stated that Choudhury was "a 30-year-old Asian female of Bengali national origin who was employed by [H+H] from June 5, 2023, until April 24, 2024." *Id.* It stated that Choudhury was "discharged on October 26, 2023." *Id.* The EEOC Charge detailed the discriminatory comments by Choudhury's colleagues and supervisors, Choudhury's complaints about those comments, and the Barker termination. *Id.* at 2–4. The last incident detailed by the EEOC Charge occurred on October 27, 2023, when Choudhury spoke with the "front desk lady" about the Barker termination. *Id.* The EEOC Charge did not expressly reference the disciplinary charges initiated against Choudhury or the circumstances of her official termination. *Id.*

On April 23, 2025, the EEOC issued Choudhury a notice of her right to sue. *Id.* ¶ 8.

### F.     Procedural History

On June 24, 2025, Choudhury initiated this action. Dkt. 1. On July 30, 2025, H+H moved to dismiss the Complaint. Dkt. 10. On August 20, 2025, Choudhury filed the Amended Complaint, the operative complaint today. Dkt. 14. On September 24, 2025, H+H moved to dismiss the Amended Complaint. Dkts. 17–18 ("Mot.").[2] On October 15, 2025, Choudhury opposed the motion to dismiss. Dkt. 27 ("Opp'n"). On October 31, 2025, H+H replied. Dkt. 33 ("Reply").

## II.     Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

---

[2] On September 30, 2025, H+H moved to stay discovery pending resolution of its motion to dismiss, Dkt. 21, which the Court denied, Dkt. 28.

U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.    Title VII Claims

The AC brings two claims under Title VII. The first alleges that H+H discriminated against Choudhury "by subjecting her to a hostile work environment, disparate treatment, and termination based on her race, religion, and national origin." AC ¶ 54. The second alleges that H+H unlawfully retaliated against Choudhury by terminating her employment "based on her legally protected activities." *Id.* ¶ 59. The Court thus construes the AC as bringing claims of hostile work environment, and retaliatory and discriminatory termination (collectively, the "termination claims"), under Title VII.

### A.    Termination Claims

H+H argues that Choudhury failed to exhaust her administrative remedies with respect to the termination claims and that the AC fails to state a claim as to the same. Mot. at 11–17.

#### 1.    Exhaustion

"Exhaustion of administrative remedies through the EEOC is an essential element of the Title VII . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal

9

court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (citation omitted). "Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006). The Second Circuit "has recognized that '[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir. 2001)).

H+H argues that Choudhury failed to exhaust her administrative remedies with respect to any claims based on the disciplinary charges and her official termination. Mot. at 11–12. Choudhury counters that those events are "reasonably related" to the complaints stated in the EEOC Charge, such that "any reasonable investigation into" her claims of discrimination and retaliation "would have uncovered the [] related facts culminating in her termination." Opp'n at 11–12.

In assessing whether claims are reasonably related, "the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (citation omitted). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" *Dreyer v. U.S. Dep't of Just.*, No. 23 Civ. 9407, 2025 WL 896497, at *8 (S.D.N.Y. Mar. 24, 2025) (quoting *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008)). "This exception to the exhaustion requirement 'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that

their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [she] is suffering.'" *Deravin*, 335 F.3d at 201 (citation omitted).

Although the EEOC Charge did not expressly address the circumstances of Choudhury's official termination in April 2024, it referenced her discharge in October 2023, and several aspects of the charge would have notified the EEOC of the official termination and disciplinary process that preceded it. First, the EEOC Charge stated that Choudhury was employed until April 2024 but discharged in October 2023. EEOC Charge at 2. A reasonable investigation of the Barker termination would assuredly have explored this oddity and inquired into the six-month intervening period, Choudhury's employment status during it, and the reason(s) for Choudhury's official termination in April 2024. Second, the EEOC Charge stated that Choudhury "did not receive" an official termination letter "until almost six months" after the Barker termination. *Id.* at 4. That should have alerted the EEOC to the connection between the two events, and to Choudhury's allegation that the official termination effectively ratified the Barker termination. Third, the EEOC Charge stated that Choudhury experienced discrimination until April 24, 2024. It is thus reasonable to assume that the EEOC's investigation would have encompassed events on and leading up to that date.

H+H's arguments to the contrary are unpersuasive.

First, H+H argues that the reasonably related exception "applies only to alleged retaliatory conduct that occurred *after* the EEOC charge is filed." Mot. at 13 (emphasis in original). That is wrong. *See Francis v. City of New York*, 235 F.3d 763, 766 (2d Cir. 2000) ("'reasonably related' test is not limited to plaintiffs alleging post-charge conduct"). And *Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018) is not to the contrary. That case held that the reasonably related doctrine does not permit a plaintiff to bring a Title VII retaliation

11

claim based on alleged retaliation post-dating the EEOC investigation and follow-on court case. *Id.* at 624. Here, because Choudhury's official termination occurred before the EEOC Charge was filed, that limitation is irrelevant.

Second, H+H suggests that, even if the EEOC Charge were sufficient to alert the EEOC to Choudhury's official termination, its failure to mention "disciplinary charges" renders a retaliation claim based on the disciplinary process improper. Mot. at 12–14. But, for the reasons above, the allegations in the EEOC Charge should have placed the EEOC on notice of Choudhury's disciplinary proceedings, which occurred during the period of discrimination alleged in the EEOC Charge, preceded her official termination, and were referenced in her termination letter. *See* Termination Letter.

The Court thus finds that Choudhury's termination claims are reasonably related to the allegations in the EEOC Charge. Accordingly, Choudhury has properly exhausted her termination claims. *See, e.g., Edo v. Antika Pizzeria Astoria, Inc.*, No. 15 Civ. 5605, 2019 WL 4602799, at *11 (E.D.N.Y. Sept. 23, 2019) (applying reasonably related exception where EEOC charge alleged plaintiff reported discrimination and was terminated, which was "enough for the EEOC to consider that plaintiff may have been terminated for reporting age discrimination"), *aff'd*, 852 F. App'x 618 (2d Cir. 2021) (summary order); *Coffey v. Cushman & Wakefield, Inc.*, No. 1 Civ. 9447, 2002 WL 1610913, at *6 (S.D.N.Y. July 22, 2002) (same where plaintiff had "been terminated before she filed her EEOC Charge" and investigation of such termination "could have reasonably been expected to grow out of the charge of discrimination"); *see also Dreyer*, 2025 WL 896497, at *9 (same where termination "effectively finalized" an indefinite suspension, which was properly alleged in EEOC charge).

## 2.    Failure to State a Claim

H+H next argues that Choudhury's termination claims should be dismissed for failure to state a claim. To state a Title VII retaliation claim, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) 'because' [s]he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). To state a Title VII discriminatory termination claim, "a plaintiff must plausibly allege that (1) the employer took adverse action against [her], and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Id.* at 87.

H+H argues the AC does not plausibly allege Choudhury's termination was discriminatory or retaliatory because the alleged perpetrators of Choudhury's discrimination are not alleged to have played a part in her official termination. Mot. at 15. Choudhury counters that Barker, who made numerous comments related to Choudhury's race, religion, and national origin, was the "decision-maker" with respect to her termination because the official termination finalized his earlier firing of Choudhury. Opp'n at 15. At a minimum, she argues, the AC supports that Barker and other supervisors "influenced the termination decision, as they were the only individuals alleged to have first-hand knowledge of [Choudhury's] employment and of the involuntary leave that Barker caused." *Id.* at 16 (citing *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272–74 (2d Cir. 2016)).

In citing *Vasquez*, Choudhury appears to invoke the "cat's paw" theory of Title VII liability.[3] "Under a cat's paw theory, an employer is liable if 'an employee is fired or subjected

---

[3] The metaphor derives from one of Aesop's fables, in which a "monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v.*

13

to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.'" *Whitney v. Montefiore Med. Ctr.*, No. 21 Civ. 9623 (PAE), 2023 WL 7386400, at *15 (S.D.N.Y. Nov. 8, 2023) (quoting *Vasquez*, 835 F.3d at 272), *aff'd,* 2025 WL 2101512 (2d Cir. July 28, 2025); *see also Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019) ("If an employee manipulates an employer into acting as a mere conduit for his retaliatory intent, the employee's intent can be imputed to the employer under a negligence (*i.e.* a knew or should have known) standard." (cleaned up)). This is a "slight variation" on the rule that "employers may be held vicariously liable for the conduct of their agents." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 37 (2d Cir. 2019). To plausibly plead cat's paw liability, a complaint must allege that the agent: (1) intended to discriminate or retaliate against the plaintiff, (2) intended that the adverse action occur, and (3) proximately caused the adverse result. *See id.* at 37–38. Such factors "provide for liability where the employer was negligent because it acted at the agent's behest when it knew or should have known of the agent's discriminatory motivation." *Id.* at 38.

The AC adequately alleges H+H's liability on this basis.

First, the AC plausibly alleges Barker's discriminatory and retaliatory intent. It alleges that he made comments to Choudhury about her race, national origin, and religion, and expressed frustration about her prior complaints. On July 5, 2023, the AC alleges, Choudhury reported to Barker that she had been denied permission to attend Friday prayer, to which he "offered no

---

*Proctor Hosp.*, 562 U.S. 411, 416 n.1 (2011). As applied in the employment context, "by merely effectuating or 'rubber-stamping' a discriminatory employee's 'unlawful design,' the employer plays the credulous cat to the malevolent monkey and, in so doing, allows itself to get burned— *i.e.*, successfully sued." *Vasquez*, 835 F.3d at 272 (cleaned up).

14

response," and "laughed, pushed past her, and entered the elevator without saying another word." AC ¶ 28. On October 19, 2023, the AC alleges that Barker told Choudhury, in a meeting with several colleagues, that he had "heard a lot of things" about Choudhury's complaints, and said, "[W]ho do you think you are? This is a city hospital—you think people care and listen to your concerns." *Id.* ¶ 40. At that same meeting, Barker also allegedly stated that he "can't stand Muslims" and that Choudhury "should be lucky to work here. No one can stand Muslims or Bangladeshi immigrants in this clinic." *Id.* On October 23, 2023, Barker told Choudhury to "stay away" because he didn't want to become "Muslim," and said under his breath, "I can't stand Muslims." *Id.* ¶ 42. On October 26, 2023, when Barker fired Choudhury, he told her that it was because she was "Muslim," and he does not "like Muslims." *Id.* ¶ 43. The EEOC Charge states that Barker also told Choudhury, "I am tired of your bs." EEOC Charge at 3–4.

Second, the AC plausibly alleges that Barker intended to cause the adverse action—Choudhury's termination. It alleges that he personally fired her and directed her to return her ID and other company property. AC ¶ 43.

Third, the AC plausibly alleges that Barker's acts proximately caused Choudhury's termination. The AC alleges that, as ordered by Barker, Choudhury returned her ID and other company property to human resources on the day of her firing. *Id.* It alleges that for the ensuing months, she "remained in limbo"—unsure if and how she should return to work. *Id.* ¶ 46. And it alleges that, on January 9, 2024, Choudhury received notice from H+H that disciplinary charges were being initiated against her for her failure to report to work, *id.* ¶ 47, and that those charges resulted in her official termination on April 24, 2024, *id.* ¶ 51. There is thus a "direct relation" between the Barker termination and Choudhury's official termination. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (citation omitted).

15

Fourth, the AC plausibly alleges that H+H acted negligently by allowing Barker's acts "to achieve their desired end." *Vasquez*, 835 F.3d at 274. The AC contains limited allegations as to the basis for Choudhury's disciplinary charges and termination. *See* AC ¶¶ 47–49, 51–52. But it is reasonable to infer, based on Barker's supervision of Choudhury and position as the assistant director of nursing, that his input "comprised a significant portion of the materials that [H+H] considered in formulating her termination decision." *McDonough v. N.Y.C. Dep't of Educ.*, No. 16 Civ. 4272, 2018 WL 4636834, at *5 (S.D.N.Y. Sept. 27, 2018). H+H, however, "should have known" that Barker was untrustworthy, *Vasquez*, 835 F.3d at 276, because Choudhury had previously reported instances of discrimination by him to supervisors, AC ¶¶ 42, 44. H+H thus is plausibly alleged to have acted negligently in terminating an employee based, either directly or indirectly, on Barker's say-so.[4]

Accordingly, the AC's allegations support imputation of Barker's discriminatory and retaliatory intent to H+H. The Court thus finds that the AC has plausibly stated discriminatory and retaliatory termination claims, and denies H+H's motion to dismiss on this basis. *See, e.g.*, *McDonough*, 2018 WL 4636834, at *5 (applying cat's paw theory to find complaint plausibly alleged employer's liability for discriminatory termination); *Menaker*, 935 F.3d at 38 (same); *Emanuel v. Gap, Inc.*, No. 19 Civ. 3617, 2023 WL 5211007, at *12–13 (S.D.N.Y. Aug. 14, 2023) (same with respect to retaliatory termination claim); *Vasquez*, 835 F.3d at 276 (same).

---

[4] On summary judgment, H+H will be at liberty to argue that it was not negligent, including on the grounds that (1) the evidence does not support that it relied on Barker's complaints in terminating Choudhury, or (2) it independently verified Barker's account. *See, e.g., Rossbach v. Montefiore Med. Ctr.*, No. 19 Civ. 5758, 2021 WL 930710, at *5 (S.D.N.Y. Mar. 11, 2021) (finding no negligence on part of employer who "did not rely on" discriminatory employee's report in firing plaintiff, and "conducted a process that involved an observational report by a different employee"). Taking the AC's allegations as true, however, as the Court must at this stage, H+H's negligence with respect to the official termination is well-pled.

16

B.    **Hostile Work Environment Claim**

H+H next moves to dismiss the hostile work environment claim as time-barred and for failure to state such a claim. Mot. at 9–11.

1.    **Timeliness**

"Under Title VII, individuals alleging discrimination must file a charge with the EEOC within 180 days or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (quoting 42 U.S.C. § 2000e-5(e)(1)).

H+H argues that Choudhury's hostile work environment claim is time-barred because it is based on allegations from before January 24, 2024 (300 days prior to the filing of her EEOC Charge). Mot. at 10. H+H states that the AC's only allegations post-dating January 24, 2024 relate to Choudhury's official termination on April 24, 2024. *Id.* (quoting AC ¶¶ 51, 52). Choudhury counters that the AC's earlier allegations are "timely under the continuing violation doctrine." Opp'n at 7.

The continuing violation doctrine is an exception to the rule that, under Title VII, "a claim generally accrues once the plaintiff knows or has reason to know of the injury which is the basis of [her] action." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (citation omitted). "When a plaintiff experiences a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Id.* (citation omitted). "The policy need not be 'formal' or 'widespread,' but the employer must permit the conduct 'to continue unremedied for so long that

17

its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination.'" *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 301 (S.D.N.Y. 2009) (quoting *Fitzgerald*, 251 F.3d at 362).

Choudhury argues that her official termination was the "culmination of a continuous pattern of discrimination and retaliation" such that it renders her hostile work environment claim timely. Opp'n at 9. That theory is well pled, as the AC's allegations support that that act was the last step in a continuing violation. A "discrete discriminatory act, such as termination, within the limitations period may . . . render a hostile work environment claim timely if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment claim.*"* *King v. Aramark Servs. Inc.*, 96 F.4th 546, 561 (2d Cir. 2024) (emphasis omitted). H+H does not dispute that Choudhury's official termination was within the limitations period. Mot. at 10. And although the question is fairly debated, on balance, the AC plausibly alleges that that act was part of the same course of conduct underlying Choudhury's hostile work environment claim.

In assessing the relatedness of timely and untimely instances of discrimination, "courts have considered factors such as '(1) whether the timely and untimely harassment is of a similar nature, (2) whether the same individuals perpetuated the harassment, (3) the frequency and temporal proximity of the acts, and (4) whether the employer took any intervening remedial action.'" *Bonterre v. City of New York*, No. 18 Civ. 745, 2021 WL 4060358, at *3 (S.D.N.Y. Sept. 7, 2021) (cleaned up) (quoting *Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, No. 15 Civ. 3363, 2018 WL 2416568, at *13 (S.D.N.Y. May 29, 2018)).

Two factors favor linking the official termination to the (time-barred) earlier acts the AC cites in support of its hostile work environment claim.

First, there are similarities between the two sets of allegations, most obviously that both involved the termination of Choudhury—first, informally, by Barker, and second, formally, by other H+H officials. The events are also causally connected: had it not been for Barker's firing of Choudhury, she would not have been placed on the unpaid leave that led to her absence from work, which in turn formed the stated basis for her official termination.

Second, the untimely allegations occurred in relatively close proximity to the timely allegations, supporting that they were "part of the same series of events." *Garcia v. Westhampton Primary Care*, No. 23 Civ. 4319, 2025 WL 2614945, at *14 (E.D.N.Y. Sept. 10, 2025). Six months separated the two terminations. *Cf. Bonterre*, 2021 WL 4060358, at *3 (noting relatedness is "'less plausible' . . . when there are gaps of one year or more" separating untimely and timely allegations (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010))).

That said, the other two factors do not affirmatively support a finding of relatedness. First, the AC does not allege that the same individuals who perpetrated Choudhury's harassment were involved in her official termination. But it is plausible to infer (and to expect discovery to support) that Choudhury's official termination relied on the input of personnel such as Barker, Lebron, and Ramos, who supervised and worked with Choudhury. Second, the AC's allegations suggest that H+H took intervening remedial action by reversing the Barker termination. AC ¶ 45. But the AC also alleges that, notwithstanding that reversal, H+H otherwise did not remedy the harm to Choudhury: it did not respond to her discrimination complaint or even return her confiscated ID, thus leaving Choudhury "in limbo." *Id.* ¶¶ 45–46. In this context, H+H's intervention cannot be said to have clearly severed the two periods of alleged discrimination.

19

Accordingly, at this early stage of the litigation, with all reasonable inferences required to be drawn in the plaintiff's favor, the Court cannot pretermit Choudhury's continuing violation claim. Following discovery, of course, H+H will be at liberty, at summary judgment and/or trial, to renew this argument, based on the evidence adduced. *See, e.g.*, *EEOC v. UPS, Inc.*, 15 Civ. 4141, 2017 WL 9482105, at *15 (E.D.N.Y. Mar. 9, 2017) ("Many courts have found such a decision as to whether a plaintiff's claims constitute a continuing violation an issue that should be determined by a trier of fact."); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("Because the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." (citation omitted)); *Goodwine v. City of New York*, No. 15 Civ. 2868, 2016 WL 3017398, at *5 (S.D.N.Y. May 23, 2016) (declining to resolve continuing violation doctrine at motion to dismiss stage where statute of limitations issue was insufficiently clear on the face of the complaint).

Based on the pleadings, the Court finds Choudhury's official termination plausibly linked to the allegations forming the basis of the AC's hostile work environment claim. The Court, in evaluating the AC's Title VII claims, may thus consider the statements and actions alleged to have occurred before January 24, 2024. *See, e.g.*, *Troeger v. JetBlue Airways Corp.*, No. 23 Civ. 10859, 2024 WL 5146185, at *6 (S.D.N.Y. Dec. 17, 2024) (applying continuing violation doctrine where plaintiff alleged pattern of discrimination outside limitations period that culminated in pretextual termination during limitations period); *Puris v. TikTok Inc.*, No. 24 Civ. 944, 2025 WL 343905, at *4, *10 (S.D.N.Y. Jan. 30, 2025) (same where only timely act alleged—plaintiff's termination for "performance reasons"—was "linked" to earlier course of

20

discriminatory conduct); *Doyle v. Am. Glory Rest. Corp.*, No. 23 Civ. 7624 (PAE), 2024 WL 1466161, at *4 (S.D.N.Y. Apr. 4, 2024) (same, noting that, "even if the pleadings had confined" offensive comments to those outside limitations period, demotion and constructive termination "are plausibly viewed as acts of harassment in furtherance of the alleged hostile work environment").

### 2.    Failure to State a Claim

H+H argues that the AC fails to state a hostile work environment claim "because a termination is a discrete act" and a hostile work environment claim "may not be predic[a]ted on discrete acts." Mot. at 10. The Court has rejected that argument. H+H does not contest that, considering the full range of factual allegations, a plausible such claim has been pled. It clearly has. *See, e.g.*, *Williams v. City of New York*, No. 16 Civ. 8193, 2018 WL 4308552, at *6 (S.D.N.Y. Sept. 10, 2018) (hostile work environment claim plausibly pled where "allegations depict a scheme orchestrated . . . to oust [p]laintiff from her position on the basis of her race and/or national origin"); *Ward v. Shaddock*, No. 14 Civ. 7660, 2016 WL 4371752, at *7 (S.D.N.Y. Aug. 11, 2016) (same where plaintiff alleged "a steady barrage of opprobrious racial comments" (citation omitted)); *Peguero-Miles v. City Univ.*, No. 13 Civ. 1636, 2014 WL 4804464, at *8 (S.D.N.Y. Sept. 25, 2014) (same where plaintiff alleged "dozens of remarks on an ongoing basis . . . that pejoratively discuss [p]laintiff's race and national origin," and that, in response to her complaints, she was denied work opportunities and told by supervisor "to stop complaining"). The Court therefore denies the motion to dismiss the AC's hostile work environment claim.

## IV.     Section 1983

The AC brings retaliation and discrimination claims under § 1983.  AC ¶¶ 63–72.  H+H moves to dismiss both on the ground that the AC's allegations do not support municipal liability. Mot. at 18–25.

### A.     Applicable Law

"A municipality cannot be made liable under § 1983 by application of the doctrine of *respondeat superior*, but rather the plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (cleaned up) (citation omitted); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

There are four ways to establish the existence of an official policy or custom—the first element of a *Monell* claim.  A plaintiff may plead that the constitutional violation was caused by:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citation omitted).

22

### B.    Analysis

Choudhury advances two theories of municipal liability.  First, Choudhury argues that the widespread failure of colleagues and supervisors to respond to her repeated complaints of discrimination supports that H+H constructively acquiesced to those constitutional violations. Opp'n at 18–19.  Second, she argues that Joslyn, who signed the official termination letter, had final policymaking authority with respect to Choudhury's employment.  *Id.* at 23–24.

### 1.    Constructive Acquiescence

The actions of a subordinate municipal employee may provide the basis for municipal liability where the employee's unconstitutional conduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).  "In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'"  *Lucente*, 980 F.3d at 298 (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012)).  "It is only at that point that, although not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware."  *Id.*

For two reasons, the AC's allegations fall short of those that courts have deemed adequate to support municipal liability based on constructive acquiescence.

First, on the basis of the allegations in the AC, Choudhury is the only employee to have experienced such discriminatory statements and conduct.[5]  This case is therefore far afield from cases involving misconduct so "persistent and widespread" that "a supervising policymaker must

---

[5] The AC alleges that H+H employees have made statements indicative of a practice of not hiring Muslims.  *See* AC ¶¶ 31, 40.  But those allegations, even if assumed to be well-pled, describe a practice aimed at job applicants, not employees.

have been aware." *Lucente*, 980 F.3d at 298–99 (finding correctional officer's sexual misconduct, perpetrated against six inmates over a period of approximately 18 months, "was executed in a manner that would have been difficult to conceal from supervisory personnel"); *see, e.g.*, *L.B. v. City of New York*, No. 23 Civ. 8501, 2025 WL 788662, at *8 (E.D.N.Y. Mar. 12, 2025) (constructive acquiescence adequately alleged where complaint "detail[ed] no fewer than twenty instances of at least seven [officials] identified by name . . . violating plaintiffs' rights in the manner described"); *Peguero-Miles*, 2014 WL 4804464, at *10 (same where plaintiff alleged "similar complaints made by colleagues, including one who was subsequently fired").  In the absence of a wide pattern of misconduct, courts have declined to find municipal liability based on constructive acquiescence.  *See, e.g.*, *Awad v. City of New York*, No. 13 Civ. 5753, 2014 WL 1814114, at *13 (E.D.N.Y. May 7, 2014) (no municipal liability where plaintiff "only pled that [agency] failed to respond to *plaintiff's* complaints," not a pattern of "failing to act in response to employee complaints" (emphasis added)); *Rivera v. Bd. of Educ.*, No. 19 Civ. 11624, 2021 WL 5399437, at *9 (S.D.N.Y. Nov. 18, 2021) (finding "[p]laintiff's allegations concerning other colleagues' complaints . . . to be too vague to permit a plausible inference that the [agency] constructively acquiesced in a policy of discrimination at the School").

Second, the AC does not allege actual or constructive awareness of the alleged discrimination against Choudhury by senior policymaking officials.  *Cf. Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) (facts supported municipal liability where coordinator of employee relations discussed plaintiff's complaints with him, and director of human resources "knew of but chose not to investigate the harassment"); *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 192–93 (2d Cir. 2025) (same where plaintiff complained to senior officials, who conveyed complaints to chancellor of the Department of Education, but no one

24

intervened); *Peguero-Miles*, 2014 WL 4804464, at *10 (same where complaint alleged "numerous complaints to senior officials that went unheeded," including an allegation that agency's executive director "told her to stop complaining"). Choudhury reported discriminatory incidents to head nurses, a clinic director, and an assistant director of nursing, but the AC does not allege that her complaints reached senior officials with policymaking authority.[6] Although Joslyn, the director of employee relations, signed Choudhury's official termination letter, she is not plausibly alleged to have been a policymaking official with respect to employment matters— an issue addressed below. Accordingly, on the facts pled, there is no basis to conclude that senior policymaking officials actually or constructively acquiesced in the sustained discrimination that Choudhury alleges. *See, e.g., Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019) (declining to find municipal liability where there were no allegations that official engaged in discrimination "communicated this attitude directly to senior policymaking officers or in a manner that should have made senior policymaking officers aware of his discriminatory animus"); *see also Mulligan v. Town of Hempstead*, No. 21 Civ. 964, 2024 WL 84829, at *15 (E.D.N.Y. Jan. 8, 2024) (same where "plaintiff's argument focuses on [commissioner]'s alleged acquiescence," but "plaintiff has not offered evidence indicating that [commissioner] was a policymaker with respect to the conduct challenged in her lawsuit").

Constructive acquiescence therefore does not provide a basis for subjecting H+H to liability for the alleged discrimination against Choudhury. *See, e.g., Awad*, 2014 WL 1814114, at *13; *Mulligan*, 2024 WL 84829, at *15; *Rivera*, 2021 WL 5399437, at *9.

---

[6] The Court's finding that the AC plausibly stated termination claims based on a cat's paw theory of liability is in accord, as that theory does not require awareness or involvement by senior policymakers.

## 2.    Final Policymaking Authority

Municipal liability may also be imposed based on "a 'single decision by a municipal policymaker.'" *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (cleaned up) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  To viably plead this theory of liability, a complaint must allege that the "official has final authority over significant matters involving the exercise of discretion," such that "the choices he makes represent government policy." *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983).  It must also allege that the challenged actions were "within that official's area of policymaking authority." *Roe*, 542 F.3d at 37.  "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Id.*

The AC alleges that Choudhury's termination letter was signed by Joslyn, the director of employee relations.  AC ¶ 51.  It alleges that, in that role, Joslyn oversaw "labor and employee relations functions, including the handling [of] and response to employee complaints," and "the development and implementation of personnel policies." *Id.* ¶ 51 n.1.  "Based on the scope and nature of these duties," the AC alleges, "she exercise[d] final policymaking authority with respect to such matters within the organization." *Id.*

These allegations do not support that Joslyn had final policymaking authority with respect to personnel decisions.  "The critical characteristic of final policymakers when employment is at issue is whether the municipal official has the authority to formulate the rules governing personnel decisions rather than the authority to make decisions pursuant to those rules—*e.g.*, the hiring and firing of subordinates." *Chin v. N.Y.C. Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008).  Although the AC alleges that Joslyn had the "discretion to hire and fire employees," it does not plausibly allege that she was the "official responsible for

26

establishing . . . employment policy." *Pembaur*, 475 U.S. at 483 n.12. The AC also does not "reference any state law supporting" its claim that Joslyn "was a final policymaker." *Canner v. City of Long Beach*, No. 12 Civ. 2611, 2014 WL 2862791, at *11 (E.D.N.Y. June 23, 2014) (citation omitted); *see also Moore v. City of New York*, No. 8 Civ. 8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) (dismissing *Monell* claim where complaint "cite[d] no authority suggesting that" officials had final policymaking power). Although the allegations might support that Joslyn was a "final decisionmaker," they do not support that she was a "final policymaker." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 92, 100 (2d Cir. 2020) ("[B]y equating a final decisionmaker with a final policymaker, [plaintiff's] approach would effectively impose *respondeat superior* liability—making the municipality liable for the conduct of its employees—in violation of *Monell* itself.").

Choudhury makes two arguments to the contrary. Neither is availing.[7]

First, she argues that the extent of Joslyn's involvement in Choudhury's termination is a "fact issue[] that must be resolved through discovery." Opp'n at 23. But the Court's holding does not depend on the extent of Joslyn's involvement. Regardless how involved she was in Choudhury's termination, she is not plausibly alleged to have been a final policymaker with respect to personnel matters.

Second, Choudhury argues that whether someone is a final policymaker is a "fact-intensive inquiry" that is "inappropriate at the pleading stage." Opp'n at 24 (citation omitted). But the cases on which Choudhury relies for this proposition arise in the distinct context of the

---

[7] Choudhury also argues that, even if Joslyn were not a final policymaker, her termination of Choudhury can provide a basis for municipal liability if a policymaker "ordered or ratified" Joslyn's actions. Opp'n at 24. But for the reasons discussed, the AC's allegations do not support that such was the case.

"policy-maker exception" to First Amendment claims alleging termination based on political affiliation (which involve factors not relevant in the *Monell* context). *See Torres v. LaLota*, No. 15 Civ. 7097, 2017 WL 4457514, at *6 (E.D.N.Y. Sept. 30, 2017); *Almonte v. City of Long Beach*, No. 4 Civ. 4192, 2009 WL 962256, at *5 (E.D.N.Y. Mar. 31, 2009). Courts assessing municipal liability claims on motions to dismiss frequently have found plaintiffs' allegations inadequate to support an official's final policymaking authority. *See, e.g., Buchanan v. City of New York*, 556 F. Supp. 3d 346, 364 (S.D.N.Y. 2021); *Acevedo v. City of New York*, No. 24 Civ. 558, 2025 WL 2802764, at *12 (S.D.N.Y. Oct. 1, 2025); *Clarke v. Antonini*, No. 21 Civ. 1877, 2022 WL 4387357, at *7 (S.D.N.Y. Sept. 22, 2022).

Because Choudhury fails to allege municipal liability, her § 1983 claims against H+H require dismissal. *See, e.g., Cater v. New York*, No. 17 Civ. 9032, 2019 WL 763538, at *4 (S.D.N.Y. Feb. 4, 2019) (dismissing *Monell* claim where complaint "pled no facts to suggest that [defendant] had authority over creating personnel policy"); *Canner*, 2014 WL 2862791, at *11 (same where complaint alleged official was granted discretion in performance of his duties but did "not reference any state law" suggesting final policymaking authority); *Schwab v. Smalls*, 435 F. App'x 37, 40 (2d Cir. 2011) (summary order) (affirming dismissal of *Monell* claim where plaintiff "has not adequately alleged that any of the individual defendants had final authority to establish municipal policy with respect to the hiring and firing" of municipal employees (citation omitted)).

## V.    State and City Law Claims

The AC brings discrimination and retaliation claims under the NYSHRL and NYCHRL. AC ¶¶ 73–92. H+H argues that the Court should decline to exercise supplemental jurisdiction or,

28

in the alternative, dismiss the AC's prayers for punitive damages for those claims. Mot. at 25–26.

### A.    Supplemental Jurisdiction

H+H argues that, if the Court were to dismiss all of the AC's federal claims, it should decline to exercise supplemental jurisdiction over its state and city law claims. Mot. at 26. The Court, however, has sustained the AC's Title VII claims, and thus denies the motion to dismiss the NYSHRL and NYCHRL claims.

### B.    Punitive Damages

The AC seeks punitive damages, among other monetary relief, for its state and city law claims. AC ¶¶ 77, 82, 87, 92. H+H moves to dismiss the prayers for such relief because punitive damages "may not be assessed against a municipal corporation in a civil-rights action." Mot. at 25. That is correct. In addition, the AC's bid for such relief under the NYSHRL is separately barred because that statute "does not provide for punitive damages." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001).

"The general rule today is that no punitive damages are allowed [against a municipality] unless expressly authorized by statute." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 n.21 (1981). The Second Circuit has held, consistent with the New York Court of Appeals, that "punitive damages are not available against a municipality" under the NYCHRL. *Krohn v. N.Y.C. Police Dep't*, 372 F.3d 83, 85–86 (2d Cir. 2004).[8] Accordingly, the Court grants H+H's

---

[8] Choudhury argues that the NYCHRL rebuts the common-law presumption against the availability of punitive damages from municipalities. Opp'n at 25. Choudhury relies on *Gilead Community Services, Inc. v. Town of Cromwell*, 112 F.4th 93, 103–04 (2d Cir. 2024), which held punitive damages available against municipalities under the Fair Housing Act. But that decision concerned a different statute. Unless and until the Circuit revisits *Krohn, see Jordan v. City of New York*, No. 23 Civ. 4962, 2024 WL 4872186, at *4 (S.D.N.Y. Nov. 22, 2024), the Court is bound by that decision, which squarely holds that a plaintiff claiming employment

motion to dismiss the prayers for punitive damages in the AC's fifth, sixth, seventh, and eighth causes of action. *See, e.g., Rosen v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 6670, 2019 WL 4039958, at *9 (S.D.N.Y. Aug. 27, 2019) (dismissing request for punitive damages because "such relief is unavailable under the . . . NYSHRL" altogether and unavailable under the NYCHRL against a municipality); *Brandon v. O'Mara*, No. 10 Civ. 5174, 2011 WL 4478492, at *9 (S.D.N.Y. Sept. 28, 2011) (same); *Villar v. City of New York*, No. 9 Civ. 7400, 2017 WL 4512507, at *6 n.2 (S.D.N.Y. Sept. 25, 2017) (noting, in employment discrimination lawsuit under NYSHRL and NYCHRL, that "punitive damages are not available against a municipality").

## CONCLUSION

For the reasons stated above, the Court grants the motion to dismiss the AC's § 1983 claims and prayers for punitive damages under the NYSHRL and NYCHRL. The Court otherwise denies the motion to dismiss.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 17.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: February 6, 2026
    New York, New York

---

discrimination cannot recover punitive damages from the City of New York under the NYCHRL, 372 F.3d at 86.